UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| POLYMER TECHNOLOGY SYSTEMS, INC., | ) ) ) | |
| Plaintiff, | ) ) | 1:14-cv-01317-RLY-DKL |
| vs. | ) ) ) | **UNDER SEAL** |
| JANT PHARMACAL CORPORATION, *et al.* | ) ) ) | |
| Defendants. | ) | |

### ENTRY ON DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND VENUE

Plaintiff, Polymer Technology Systems, Inc. ("Plaintiff" or PTS"), produces a hand-held, point-of-care testing system that can test for total cholesterol, high-density lipoproteins (HDL), and triglycerides with a single drop of blood. This product, branded CardioChek®, is Plaintiff's flagship product. The test strip used in CardioChek® is protected by United States Patent No. 7,087,397, of which Plaintiff is the assignee. Defendants, Jant Pharmacal Corporation, Infopia American LLC, and Infopia Co., Ltd. ("Infopia Korea") (collectively, "Defendants"), sell similar testing products in the United States under the trade name "LipidPlus®" (the "Accused Products"). Plaintiff alleges the Accused Products infringe its patent and infringe its trade dress in violation of the Lanham Act. Defendants now move to dismiss Plaintiff's Complaint for lack of personal jurisdiction because they are not residents of Indiana, they have never sold the Accused Products in Indiana, and they have not purposefully directed their business activities to

1

consumers of Indiana. For the reasons set forth below, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Venue is **GRANTED**, and Defendants' alternative Motion to Transfer to the Central District of California is **GRANTED**.

## I.     Motion to Dismiss Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a court is required to dismiss an action for lack of personal jurisdiction. The court's analysis with respect to Count I for patent infringement is governed by Federal Circuit law because the jurisdictional issue is "intimately involved with the substance of the patent laws." *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1016 (Fed. Cir. 2009) (internal quotation marks and citations omitted). However, Count II for trade dress infringement is not intimately related to patent law; therefore, the court applies the law of the regional circuit, here the Seventh Circuit. *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003). As applied, these standards are largely the same. *Compare Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 780-83 (7th Cir. 2003), *with Silent Drive, Inc.*, 326 F.3d, 1201-02.

A plaintiff=s complaint need not include facts alleging personal jurisdiction. *Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 715 (7th Cir. 1998) (citing *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987)). However, once a defendant raises lack of personal jurisdiction as a defense, the plaintiff bears the burden of showing that jurisdiction is proper. *Purdue*, 338 F.3d at 782 (citations omitted). The precise nature of the plaintiff=s burden depends on whether the court's ruling is based on an evidentiary hearing or the submission of written materials. *Id.*

In the instant case, the court relies entirely on the submission of written materials. Accordingly, Plaintiffs "need only make out a *prima facie* case of personal jurisdiction." *AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1360 (Fed. Cir. 2012); *Silent Drive*, 326 F.3d at 1201; *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). In evaluating whether the prima facie standard has been satisfied, the court accepts the uncontroverted allegations in Plaintiff's Complaint as true and resolves any factual disputes regarding relevant facts in Plaintiff's favor. *AFTG-TG*, 689 F.3d at 1360; *Purdue*, 338 F.3d at 782.

## II.   Facts

The court accepts the following facts as true for purposes of the present motion.

Plaintiff is an Indiana corporation having its principal place of business in Indianapolis, Indiana. (Filing No. 1, Complaint ¶ 1). Defendant, Infopia Korea, is a foreign corporation organized under the laws of Korea having its principal place of business in Anyang-si, Kyeonggi-do, South Korea; defendant, Infopia America, is a Florida Limited Liability Company having a principal place of business in Titusville, Florida; and defendant, Jant Pharmacal, is a California corporation having its principal place of business in Encino, California. (*Id*. ¶¶ 2-4).

Plaintiff's first dealing with Infopia Korea occurred in an October 15, 2009 cease-and-desist letter, wherein Plaintiff informed Infopia Korea that it had become aware of Infopia Korea's brochures advertising products similar to Plaintiff's, and informed Infopia Korea that its products may infringe Plaintiff's '397 patent. (Filing No. 27-2,

3

Cease-and-Desist Letter).  In a letter dated October 20, 2009, Infopia Korea denied infringement.  (Filing No. 27-3, Reply Letter).

In December 2011, Infopia Korea expressed an interest in establishing an original equipment manufacturer ("OEM") partnership with PTS for a blood-glucose monitoring system.  (Filing No. 27-38, Email re: interest in OEM; *see also* Filing No. 35-2, Second Declaration of Suk Jin Lee ("S.J. Lee Dec.") ¶ 5 ("All discussions and meeting between Infopia Korea and PTS concerned the potential supply of Infopia Korea's glucose measuring technology to PTS.")).  Accordingly, on January 24, 2012, a representative of Infopia Korea visited PTS headquarters in Indianapolis to discuss the possibility of a partnership.  (Filing No. 27-7, Email exchange).  As part of that meeting, the parties signed a non-disclosure agreement.  (Filing No. 27-14, Non-Disclosure Agreement).

On February 29, 2012, three representatives from Infopia Korea visited Plaintiff's headquarters again to discuss collaborating on a "cholesterol & blood glucose 2-in-1 meter" involving "Infopia's blood-glucose monitoring device mounted on PTS' cholesterol meter." (Filing No. 27-8, Email reporting meeting with PTS).  During this visit to the United States, representatives of Infopia Korea also met with Infopia America at its Florida office.  (Filing No. 27-9, Report on U.S. Tour).

By May 2012, Plaintiff agreed to move forward with an OEM partnership to produce a blood-glucose monitoring system with Infopia Korea and in June, the parties signed a second non-disclosure agreement.  (Filing No. 27-12, Email re: OEM; Filing No. 27-15, Non-Disclosure Agreement).  In July 2012, the parties met again at Plaintiff's

4

headquarters in Indianapolis, but for reasons unknown, the partnership stalled soon thereafter. (Filing No. 27-11, Email re: meetings).

In mid-November 2012, Infopia Korea, Infopia America, and Jant began discussions regarding the design of a cholesterol test system. (Filing No. 27-19, Email re: product certifications). In February 2013, Infopia Korea signed an Operating Agreement with Infopia America, which established Infopia America as the exclusive importer of Infopia Korea products, including the Accused Products. (Filing No. 27-16, Amended Operating Agreement; Filing No. 23-1, S.J. Lee Dec. ¶ 21). Infopia America receives orders for the Accused Products and places them with Infopia Korea, and Infopia Korea ships the Accused Products directly to Los Angeles, California. (Filing No. 23-2, Declaration of Sungho Lee ("S. Lee Dec.") ¶ 21). After clearing customs in Los Angeles, the Accused Products are forwarded to Jant's facility in Encino, California. (*Id.*). Jant stores the products in its Encino location and ships the Accused Products directly to end users and distributors directly from Encino. (Filing No. 23-3, Declaration of Samuel Elkin ("Elkin Dec.") ¶¶ 19-20).

On February 12, 2014, Jant began to ship free demos and samples of the Accused Products to distributors in Kansas, Pennsylvania, Ohio, Minnesota, Texas, Alabama, New York, Florida, North Carolina, California, Mississippi, Missouri, Wisconsin, Louisiana, Kentucky, and Indiana. (Filing No. 27-25, Jant's LipidPlus Demos and Samples by Customer Detail). The shipments to Indiana occurred on July 10 (four demos) and July 25 (two demos) and were sent to sales representatives for STAT Technologies in Fishers,

Indiana. (*Id*. at JANT0000045). There is no evidence, however, of an actual sale of an Accused Product in Indiana. (Elkin Dec. at ¶¶ 21-23).

In addition, in 2014, Defendants advertised the Accused Products in national print magazines and publications for the medical industry. (Filing No. 27-26, American Pharmacists Association "Showcase" feature, April 2014); Filing No. 27-27, Physician's Office Resource (May 2014); Filing No. 27-28, Physician's Office Resource (June 2014); Filing No. 27-29, Medical Laboratory Observer, "New Products" section (May 2014); Filing No. 27-30, Repertoire Magazine, "Products" section (June 2014); Filing No. 27-31, Drug Topics, "New Products for Pharmacists" (June 2014); Filing No. 27-32, The Diabetes EDUCATOR, "Industry Update" (November/December 2014)).

On August 8, 2014, Plaintiff filed the present action in the Southern District of Indiana.

### III.   Discussion

Under the Federal Circuit, personal jurisdiction over a defendant is proper so long as: (1) it is permitted by the forum state's long-arm statute; and (2) it satisfies the Due Process Clause of the Federal Constitution. *Silent Drive*, 326 F.3d 1119, 1201 (Fed. Cir. 2003). This same standard also applies in the Seventh Circuit. *Purdue*, 338 F.3d at 782. Because Indiana=s long-arm statute, Indiana Rule of Trial Procedure 4.4(a), expands personal jurisdiction to the full extent permitted by the Due Process Clause, *LinkAmerica Corp. v. Albert*, 857 N.E.2d 961, 966-67 (Ind. 2006), the sole inquiry before the court is whether exercising personal jurisdiction over Defendants would offend due process.

The Due Process Clause of the Fourteenth Amendment limits when a court may assert personal jurisdiction over nonresident defendants.  *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997).  A nonresident defendant must "have certain minimum contacts with the [forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int=l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  The crucial inquiry is whether a defendant=s contacts with the forum state are such that it should reasonably anticipate being haled into court there.  *Int'l Med. Group*, 312 F.3d at 846 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000)).  "This . . . ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . ."  *Burger King*, 471 U.S. at 475 (citations omitted).

What the "minimum contacts" standard means in a particular case depends on whether "general" or "specific" jurisdiction is asserted.  *RAR*, 107 F.3d at 1277.  General jurisdiction over a defendant exists where the defendant has continuous and systemic business contacts with the state, even where those contacts do not relate to the action at issue.  *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984) (discussing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)).  Specific jurisdiction, on the other hand, "exists for controversies that arise out of or are related to the defendant's forum contacts."  *Hyatt Int=l Corp. v. Coco*, 302 F.3d 707, 713

7

(7th Cir. 2002) (citing *Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 714 (7th Cir. 1998)).

The parties focus their arguments on specific, rather than general, jurisdiction. Plaintiff maintains the court has specific personal jurisdiction under the stream of commerce theory, and under the *Calder* effects test.

### A. Stream of Commerce

Plaintiff argues the court has specific jurisdiction over the Defendants through the stream of commerce theory. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980). The stream of commerce theory "refers to the movement of goods from manufacturers through distributors to consumers. . . ." *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S.Ct. 2780, 2788 (2011). In *World-Wide Volkswagen*, the Supreme Court held that "the forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce *with the expectation* that they will be purchased by consumers in the forum state." *Id.* at 297-98 (emphasis added).

In *Asahi Metal Indust. Co. v. Superior Court of California*, 480 U.S. 102 (1987), the Justices split over the exact requirements for an application of the theory. Four Justices were of the view that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state." *Id.* at 112. As Justice O'Connor expressed it, there must be "additional conduct" indicating "an intent or purpose to serve the market in the forum state." *Id.* Four Justices, however, found this additional conduct unnecessary. According to Justice

8

Brennan, a court has personal jurisdiction over a nonresident defendant that delivers its products into the stream of commerce with the expectation that the products will be purchased by consumers in the forum state. *See id.* at 117.

In 2011, the Supreme Court revisited the stream of commerce theory in *J. McIntyre Machin. Ltd. v. Nicastro*, 131 S.Ct. 2780 (2011). In that case, Nicastro brought a products liability action against a British manufacturer (J. McIntyre Machinery, Ltd.), after he seriously injured his hand while using a machine manufactured by it. *See* 131 S.Ct. at 2786. The manufacturer argued the New Jersey state court lacked personal jurisdiction over it because it neither marketed goods in the state nor shipped them there. *See id.* Instead, it sent the goods to a U.S. distributor, not under the manufacturer's control, who marketed the goods at several conventions – none in New Jersey. *See id.* In addition, no more than four machines ended up in New Jersey. *See id.*

In a split decision, the Supreme Court reversed the New Jersey Supreme Court, and held the British manufacturer was not subject to jurisdiction under a stream of commerce theory. *See id.* Justice Kennedy's lead opinion rejected Justice Brennan's pure stream of commerce approach and found that "the defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.* at 2788.

With these decisions in mind, the court now turns to Plaintiff's argument, predicated on the Federal Circuit's decision in *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994), decided after *Asahi Metal* but before *J. McIntyre*.

9

In that case, the owner of a design patent for a ceiling fan (Beverly Hills Fan) brought an action for patent infringement against Ultec Enterprises Company, Ltd., and Royal Sovereign Corporation, in the United States District Court for the Eastern District of Virginia. Ultec, a Chinese corporation, manufactured the accused fan in Taiwan, and Royal, a New Jersey corporation, imported and distributed the accused fan into the United States. *Id*. at 1560. The plaintiff's complaint alleged that Ultec and Royal were selling the accused fan to customers in the Eastern District of Virginia through an intermediary; plaintiff submitted evidence that the intermediary was Builder's Square, a Virginia retailer; and plaintiff submitted evidence reflecting that fifty-two Ultec fans were present in Builder's Square bearing Royal's warranty. *Id*. at 1563-64. The district court concluded that the defendants' contacts with Virginia were not sufficiently purposeful such that litigation in the forum could reasonably be foreseen. *Id*. at 1560-61. The Federal Circuit reversed, finding that under either version of the stream of commerce theory articulated in *Asahi Metal*, Beverly made the required jurisdictional showing because the allegations and evidence submitted by the plaintiff established that the accused fans arrived in Virginia through defendants' purposeful shipment of the fans through an established distribution channel:

> [D]efendants, acting in consort, placed the accused fan in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there.

*Id.* at 1566.

Like the defendants in *Beverly Hills Fan*, Plaintiff argues the Defendants shipped the Accused Products into Indiana through an established distribution channel. Plaintiff is correct that Defendants have a contractual relationship to ship the Accused Products from South Korea into the United States for the purpose of selling the Accused Products to United States consumers. Plaintiff, however, fails to establish that Defendants purposefully directed their distribution channel toward the forum state of Indiana. *See id.* at 1565 (noting the facts in *World-Wide Volkswagen* were distinguishable because "the allegations are that the accused fan arrived in Virginia through defendants' purposeful shipment of the fans through an established distribution channel"). First, unlike the facts in *Beverly Hills Fan*, there is no evidence of sales of the Accused Product in Indiana. Indeed, even Justice Brennan's more permissive view of the stream of commerce theory in *Asahi Metal* contemplates sales in the forum state. 480 U.S. at 117 ("A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State . . . ."). Second, although Plaintiff submits evidence that Jant shipped six demos of the Accused Product to Indiana, the exhibit supporting that fact reflects that they were shipped to one sales representative of STAT Technologies in Fishers, Indiana, in July 2014. (*See* Filing No. 27-25, Jant LipidPlus Demos and Samples by Customer Detail January 1, 2014 through November 21, 2014). Beyond that, there is no evidence that the Indiana sales representative shared these demos with anyone in Indiana. *See QR Spex, Inc. v. Motorola, Inc.*, 507 F.Supp.2d 650, 660 (E.D. Tex. 2007) (finding that samples sent to "four independent sales representatives" in the forum "were merely for demonstrative purposes and is insufficient to subject Oakley to jurisdiction"

because, *inter alia*, "there was no sale arising" from these samples). But even if the sales representative had shared them, the number of demos in Indiana only totals six. Much like the six machines in *J. McIntyre*, that simply is not enough to show purposeful or targeted conduct in Indiana. Third, Jant's limited advertising in national trade magazines and the like is insufficient to confer jurisdiction, as there is no evidence that the advertising campaign was seen by anyone in Indiana nor targeted to consumers in Indiana. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 105 (3d Cir. 2004) ("Advertisng in a trade publication that reaches the forum generally does not, without more, provide a sufficient basis for exercising specific jurisdiction over a foreign defendant."); *Quick Tech., Inc. v. Sage Group PLC*, 313 F.3d 338, 345 (5th Cir. 2002) (In a trademark case, "generally, advertisements are insufficient to establish personal jurisdiction"); *Seitz v. Envirotech Sys. Worldwide, Inc.*, 513 F.Supp.2d 855, 864 (S.D. Tex. 2007) (In a patent case, "national advertising that may include circulation in the forum state is generally insufficient to show jurisdiction over a nonresident defendant in that state."). Because there is no evidence that the Accused Products were distributed "into the stream of commerce with the expectation that they will be purchased by consumers in [Indiana]," *World-Wide Volkswagen*, 444 U.S. at 297-98, the court finds it does not have specific jurisdiction over the Defendants under the stream of commerce theory.

  **B.**   ***Calder* Effects Test**

  Plaintiff also argues that Defendants can be subject to specific personal jurisdiction in this court based on the "effects test," first articulated by the United States Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, a California actress

brought an action in California state court against two *National Enquirer* employees for their involvement with an allegedly libelous article written about plaintiff. The defendants, both residents of Florida, challenged personal jurisdiction in the California court. Although the article was written in Florida, "the brunt of the harm, in terms both of [plaintiff=s] emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788-89. The Supreme Court held that personal jurisdiction over the defendants was proper in California based on the "effects" of their Florida conduct in California. *Id.* at 789. In its analysis, the Court specifically noted that the defendants were "not charged with mere untargeted negligence," but rather with undertaking intentional, and allegedly tortious, actions "expressly aimed at California." *Id.* Under these circumstances, the Court concluded that defendants "must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article." *Id.* at 790 (citations omitted).

Here, Plaintiff argues the court has specific jurisdiction under *Calder* because, at the time Defendants began marketing and selling the Accused Products in 2014, they each had actual knowledge of (1) the existence of Plaintiff's '397 patent and (2) Plaintiff's residency in Indiana. In *Walden v. Fiore*, the Supreme Court specifically rejected this interpretation of *Calder*. 134 S.Ct. 1115, 1125 (2014) ("*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum.").

The *Walden* plaintiffs brought a Fourth Amendment *Bivens*' action against an agent with the Drug Enforcement Agency after the officer searched them and their carry-on luggage, seized a substantial sum of cash at an Airport in Atlanta, Georgia, and filed

13

an allegedly false and misleading probable cause affidavit in support of the forfeiture. *Id*. at 119-20. Plaintiffs, residents of Nevada, brought the action in the United States District Court for the District of Nevada. *Id*. at 1120. Relying on *Calder*, the Ninth Circuit found that the Nevada district court had jurisdiction over the "'false probable cause affidavit aspect of the case.'" *Id.* (quoting *Fiore v. Walden*, 688 F.3d 558, 577 (9th Cir. 2012)). The Court held that the agent knew the plaintiffs were Nevada residents and "expressly aimed his submission of the allegedly false affidavit at Nevada by submitting the affidavit with knowledge that it would affect persons with a significant connection to Nevada." *Id*. The Supreme Court reversed, finding the Circuit Court improperly shifted "the analytical focus from [the defendant's] contacts with the forum to his contacts with [the plaintiffs]." *Id*. at 1124. The proper jurisdictional inquiry "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id*. at 1125.

In so holding, the Supreme Court overruled the Ninth Circuit's finding that a defendant's "knowledge of [plaintiff's] strong forum connections . . . combined with its conclusion that respondents suffered foreseeable harm in Nevada, satisfied the 'minimum contacts' inquiry." The Supreme Court explained:

> This approach to the "minimum contacts" analysis impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis. Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections to the defendants.

*Id*. at 1125 (internal citation omitted).

14

Just as in *Walden*, the fact that the Defendants may have had knowledge of Plaintiff's patent and products cannot serve as the proper basis for a finding of personal jurisdiction as to any of the Defendants. Plaintiff's argument inappropriately shifts the jurisdictional inquiry from Defendants' suit-related contacts with the forum to Defendants' contacts with Plaintiff. In the absence of any evidence that Defendants' intentional conduct connects them to the forum in a meaningful way, the *Calder* effects test does not provide the means for the assertion of personal jurisdiction over the Defendants.

### C. Contract Negotiations

Lastly, Plaintiff argues that Defendants' physical presence in Indiana in 2012 amounts to purposeful contacts with Indiana. Specific jurisdiction is not appropriate "'merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must *directly arise* out of the specific contacts between the defendant and the forum state.'" *RAR*, 107 F.3d at 1278 (quoting *Sawtelle v. Farrell,* 70 F.3d 1381, 1389 (1st Cir. 1995) (emphasis added)). Here, the contacts at issue relate to Infopia Korea's prior meetings with Plaintiff regarding the manufacture of a blood-glucose monitoring system. Although the parties signed two non-disclosure agreements regarding the same, Plaintiff's cause of action for patent infringement and trade dress infringement do not directly arise out of these contacts. The patent and trade dress claims in this case arise out of Infopia Korea's LipidPlus® cholesterol monitoring system, not a blood-glucose monitoring system. Accordingly, the court finds Infopia Korea's contacts with Indiana arising out of a failed business relationship regarding a

15

product that is not at issue in this lawsuit are insufficient to confer personal jurisdiction over Infopia Korea, nor to any other Defendant.

### D. Motion to Transfer

Under 28 U.S.C. § 1400(b), "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides. . . ." Pursuant to 28 U.S.C. § 1391(c), a corporation resides in any district where it is subject to personal jurisdiction at the time the action commenced. *See VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1584 (Fed. Cir. 1990) (28 U.S.C. § 1391(c) applies for purposes of determining residence of a corporation under § 1400(b)). Thus, venue in the Southern District of Indiana is inappropriate as well. Defendants request, in the alternative, that if the court concludes that transfer, as opposed to dismissal, of this case is in the interests of justice, that the court transfer this case to the Central District of California.

The court finds the Central District of California is an appropriate venue for this case, and that transfer to the Central District of California is in the interests of justice. As discussed previously, the Accused Products are shipped from South Korea to Los Angeles, are imported into this country in Los Angeles, and stored in Jant's facility in Encino for distribution into the United States. Both Los Angeles and Encino are located in Los Angeles County which, in turn, is located in the Central District of California. *See* www.cacd.uscourts.gov. Thus, the Central District of California has a strong nexus to this case. In addition, California is a more convenient venue for the Defendants. Witnesses for Infopia Korea can fly direct from Seoul to Los Angeles, Jant resides in Los Angeles County, and the distance between Infopia Korea's Florida office and Indiana and

16

California is largely the same. Finally and significantly, the parties agreed that if the court should rule that personal jurisdiction does not properly lie in the Southern District of Indiana, then in lieu of dismissal, the case should be transferred to the United States District Court for the Central District of California. (Filing No. 24, Joint Motion to Stay Proceedings ¶ 9). Defendants' alternative motion to transfer is therefore **GRANTED**.

### IV. Conclusion

For the reasons set forth above, Plaintiff has not met its burden of establishing that the court may properly exercise personal jurisdiction over Defendants. Accordingly, the court **GRANTS** Defendants= Motion to Dismiss for Lack of Personal Jurisdiction and Venue (Filing No. 22) and **GRANTS** Defendants' alternative Motion to Transfer to the Central District of California. The Clerk is **ORDERED** to transfer this action to the Central District of California.

**SO ORDERED** this 3rd day of April 2015.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.